This court is now in session. Please be seated. Court, call the next case, please. We are going to hear from one of our people, Mr. Daniel McCoy, representing McCoy, and Mr. Charles Parsons. Thank you. Mr. Parsons, good afternoon. Good afternoon, Justice, and a day of justices. My name is Drew Charles Parsons from the Office of the State Appellate Defender and Police and Court. I've briefed two issues on this matter, and I would be more than happy to answer questions as to both. I will be devoting my time here today to the discussion of the first issue, that of my client's arrest and the insufficient basis for the police to stop my searching. Police testimony of shots fired cannot serve as a green light for a dragnet search of an entire area. Were the courts to permit such a thing, then random and unlawful detainments would surely result wherever a police officer reports the armed gunfire. In this matter, the Spring Valley Police Department engaged in an unparticularized and unlawful search of my client, based on the testimony of two officers saying that his was the only vehicle they had served in the area between 200 and 300 West Dakota Street in Spring Valley on August 31, 2021. As a result, he was the subject of an illegal and unparticularized search, which, now under the Constitution, cannot be borne. And he asks that this court reverse the lower court's decision denying his motion to suppress evidence that a gun, Luger LCP, recovered from his person in reversal of his conviction outright. Officer Behrens and Ershin of the Spring Valley Police Department adamantly maintain that Mr. McCoy's was the only vehicle they observed in an area after hearing shots. However, the video, which was entered into evidence at trial from Officer Behrens' squad car video, clearly refutes the testimony of the two officers by showing not one, but two vehicles in motion within Officer Behrens' view before he activated his stoplights and instigated what he classified as an investigatory stop of my client. Mr. McCoy, my client, was not observed breaking any traffic laws. He was not observed breaking any laws. And despite the fact that Officer Behrens says he was in a position to see my client's vehicle lights activate after the sound of shots, he does not see or report seeing any muzzle flare, gun smoke, or anybody holding a pistol in their hands prior to my client's vehicle leaving that area. There was not even a report by Officer Behrens or Ershin of him fleeing that area or speeding away from that area. Officer Behrens pursued what he saw to be a vehicle activating its headlights and driving away from an area where shots were fired and then instigated an investigatory stop. And this court is in possession of the same precedent which the lower court was in a position to review, yet did not follow its very proper example. And that's in re the matter of D.L., 2017, Bill 1st, 171764, where in the 1st District Appellate Court hearing similar facts of an officer observing some youthful individuals walking along the street shortly after the sound of shots were heard, they walked quickly away from the officers only to be pursued, apprehended, and searched whereupon they found a gun. But the trial court in D.L. concluded and was upheld by the 1st District that most people would be inclined to make a quick departure from a scene of gunfire according when such behavior was deemed to not be unusual or criminal. Yet the circuit court in this case after hearing the precedent cited in D.L. by the defense said quite simply and formulaic it's 3.37 a.m. in the morning. Gunshots. Both officers testified that he was the only vehicle they saw in the area. Ergo, he denied the motion to suppress. Your Honors, I submit that the evidence refutes the logic of the circuit court. His was not the only vehicle. Mr. McCoy's was not the only vehicle in that area after Behrens heard the shots or says he heard the shots. And furthermore, just because two officers say they hear shots does not give them license to pull over every single person they happen to see within the area. I don't doubt the state may today argue what it argued in its brief. That this court adopt the test from Peeble versus Mendez which is the spatial and temporal proximity test saying that the space and time and location of a defendant is relevant to the determination of a reasonable articulable suspicion of criminal activity. But I would urge this court that Mendez is not the authority to cite in this matter nor is it helpful in any regard because in Mendez the defendant in addition to being spatially and proximal location near the shots being fired also displayed a look of shock on his face upon seeing the officers. An unusual factor in addition to him being in that area at the time. At the heart of this case, Your Honor, is the crux of it is that mere presence in and of itself in an area where shots are reported to be fired is not a significant reasonable articulable suspicion of criminal activity that gives the police the license to engage in investigatory stuff. That is the crux of our argument here and we feel confident that this court will embrace the case of Vin Ray D.L. rather than Mendez because one, Mendez is distinguishable and two, D.L. is far more similar in circumstance to the facts of this case. And I would say that it would also go a long way towards discouraging circuit courts from engaging in the kind of rule measuring that would surely result in pockets of illegal searches and seizures. So long as the officers get up on the stand testify, they say that they've heard shots fired the spatial and proximity test is going to be like, okay, how far away were you when you heard the shot? Well, that's going to be illegal. That's going to be lawful. Well, that 50 feet, that's too far away. It's too chaotic. Too, too chaotic of a test, Your Honors, for this court to embrace especially in light of the fact that the precedence this court has maintained in People v. Sinclair and People v. Moore stress that there are limits to be placed. Limits to be placed on a police officer's ability to make an investigatory stop. And in Sinclair, this court ruled that in the name of investigating a person who's merely suspected of criminal activity the police may not carry out a full search and seizure of this person or a mobile or his other effects. And furthermore, in Moore, which I might add in the case of N. Ray D. L. based, that court based its decision on this court's decision in Moore said that flight of a person from the presence of the police is not standing alone sufficient to establish probable cause. And furthermore, it's not tolerable under the 4th and 15th, sorry, 4th and 14th Amendments to the Constitution. Were it otherwise, then the courts would just be allowing searches at random of these areas of anybody who happens to run away or flee. I submit that there's a very little difference between running away or flight than just being in an area. And then just leaving an area is not in and of itself sufficient. Yet that's what those officers believed and that's what they acted upon. And there was no other action on the part of my client that would give any officer in their position any suspicion whatsoever of his actions. That he was involved in the shooting or that he had anything to do with it. Two cars were recorded to be in motion in addition to the defendants and there were other vehicles parked in the roadway in that area. But the state takes exception to the defense's classification of that video fact evidence by saying that, well, they're going a different way or they're coming from a different direction. I submit to this court that the direction and the speed or the proximity of the motion of the other two vehicles is irrelevant to the determination of this court because my client exhibited no suspicious activity whatsoever other than being in an area where the police say they heard shots fired. Those vehicles, under that logic, would have just as much or just as little suspicion to the officer's eye as my client's vehicle. What time was this? The time of the stop occurred about the shooting occurred or the lead shooting occurred around 3.37, Your Honor. So this would have been approximately a few minutes later. 3.37 in the morning? Yes. And I submit that the court's logic about location and the policeman's logic about location this doesn't really happen here. Officer Behrens basically testified to. That's not a relevant determination either. The Constitution doesn't stop at a small town. It doesn't stop at a quiet area. It doesn't stop in a high-crime area. Area has very little to do with the officer's ability to stop a search person. What matters more is what does the officer observe particularly articulable facts of the defendant doing at that time? His activities. And they did not observe my client doing anything illegal whatsoever as they maintained over and over again both at the hearings press and at the trial itself. No speeding. No flight. No running away. No speeding away. Not so much as even crossing the median line for improper lane usage. Nothing gave these officers the ability to act in any way to invade my client's constitutionally protected rights against illegal government intrusion which is exactly what the defendant in this case suffered. And I ask this court unless there are no other questions for me to right that wrong and to reverse the lower court decision on suppression of the gun and to order the gun suppressed and to reverse my client's conviction which is the sole basis of that evidence outright. Thank you. Are there any questions? Thank you, Mr. Carson. I'll be doing the rest of my time for your book. You'll have five minutes. Mr. Atwood. Good afternoon. Good afternoon, Your Honor. May it please the court. My name is Nicholas Atwood and I represent the people of the state of Illinois in this matter. I will also focus my arguments on the first issue and rely on my brief for the second issue unless Your Honors have any specific questions about the second issue. The defendant has argued that the trial, the officer's testimony did not establish a reasonable articulable suspicion that criminal activity was afoot. And the defendant premises the majority of his argument on the fact that the officers did not actually observe the defendant commit a crime or observe the defendant fire the firearm that was used to create the sound of the gunshots. However, there's significant case law that shows that the officers don't have to observe the criminal activity. There are numerous cases involving just the sound of gunshots. Particularly people who do Mendez as one of them. And in Mendez, the court outlines a test for considering whether or not there was a reasonable suspicion based on gunshots alone. And there are several factors that that court enumerates. Specifically, there are three that are important. The first one is the size of the area where the gunshots originated from. The second are the number of persons about the area. And the third is any observed activity in the person that stopped. And what's important in this case is Officer Barron testified he was parked in his squad car on West Dakota Street, just one block west of the defendant's position. When he heard the gunshot, he observed the defendant's SUV to immediately, within a moment, turn on its lights and drive away from that area. The officer initiated a traffic stop based on that and the stop was completed maybe 15 to 20 seconds later according to his testimony. His squad car video shows about 45 seconds after the shots had occurred but before the stop has been completely initiated. And in that 45 seconds, there are no vehicles in the area. The entire premise of the defendant's argument is that there was a car on the east side of the road and there was a car on the west side of the road. We see that at the 45 second mark and at the 55 second mark. This is nearly a minute after the actual gunshots were heard. These cars are even further away if we go back in time to when the gunshots originated. It's apparent that Dakota Street is the main thoroughfare in this town and one car is several blocks away on the east side. Another car is coming from several blocks away on the west side. Logically, those vehicles would have been even further away a minute earlier when the gunshots were heard. And so it's sort of a red herring to argue that the squad car shows that other vehicles were in the vicinity. Yes, there were other vehicles in the vicinity, but not when the gunshots were heard. We have two officers testifying and the 15 to 20 seconds it took them to respond to the gunshots, they observed no vehicles. We have 45 seconds of squad car footage that shows no other activity, no other vehicles in the area. So clearly, we need to focus on when the shots were heard, not what happens as the officer is about to initiate traffic stop. And so when we look at this test that's outlined in Mendez, and we see the size of the area, a very small area, one block away, is where Officer Barron was, Officer Urshin was two blocks away, maybe around the corner is what it seems like the arrow shows. So we've clearly got officers in a very close time and in a very close space to this. And then finally, we have observed activity. We certainly don't have an officer seeing someone fire a weapon, but if he did, he wouldn't be having this argument because that's clearly going to be probably the cause for the officer to go and investigate what's happening. It's clearly a crime to discharge a firearm on a man. And so, taking those factors into account, the officers had a reasonable, articulable suspicion to make the stop. In the Mendez case, they have similar facts to this case. In Mendez, it was after 3 a.m., which is a notable time period. As Your Honor pointed out, it was 3.37 a.m. when the stop occurred. There were, you know, the officers both testified Spring Valley is a small town, I think there's around 5,000 people. It's basically dead this time of night. So it was very unusual to hear gunshots in the first place. But in Mendez, it's after 3 a.m., the officer is about 300 or 400 yards away on a different street from where the shots originated, and as he's driving to that area, he observes the defendant's vehicle with three people inside, and he does note that one of them had an expression of shock upon seeing the police car. So he initiated a traffic stop. The Mendez court found that this was acceptable, reasonable, articulable suspicion to initiate a stop, and it listed five factors when it made that consideration. First, that the officer heard gunshots, and that was a personal observation. The officer himself heard them. Second, he observed the vehicle near in origin to where the gunshots originated. They noted that it was after 3 a.m. when they heard the shots, and fourth, that there were no other vehicles in the general vicinity when those shots were heard. The fifth factor that counsel cites is the expression of shock. So clearly, when the court's listing factors in order of importance, the fact that one of the individuals in the vehicle expressed some shock was the least relevant factor that that court considered when it applied these factors enumerated by Mendez. So this case is much more similar to Mendez than it is D.L., the case the defendant relies on. In D.L., one thing that was specifically noted by the court was the time of day. It was 8.20 p.m. when the defendant was stopped in D.L. It was another individual with the defendant, and the facts of that case indicated the officer did not make this observation of gunshots. The officer was vectored there by dispatch. The officer testified that he was approximately one minute away from the location in D.L., which I believe was 117th Street in Halsted. As the officer was driving there and time was elapsing, he observed the defendant and this other individual walking on 116th Street at a normal pace, I believe, is the way it was described. And the court in the First District noted, it's 8.20 p.m., it's not unusual for someone to be walking on a sidewalk at that time. That's an important factor in this case because Chicago is a city of many millions of people. At 8.20 p.m., over the course of a minute, there could be dozens or 100 people that walk by in that same time frame. In Spring Valley, the town of 5,000, at 3.37 in the morning, there are not going to be, as the evidence showed, many other people milling about. But in fact, there were three. There were two other vehicles that were present. One of them is the same vehicle a second time. At 3.37 in the morning. Correct. On the main thoroughfare in Spring Valley. So it's, if you ever saw an app in Spring Valley, there's just one main highway that's going right through the center of town. That's Dakota Street. And if you look at the video, one of them is well away. It's not as if this is within, I would say, even 100 yards. It's probably several hundred yards away is one vehicle. A couple hundred yards away is another vehicle. This is not near in origin. Especially when you have Officer Barron testifying, I heard a gunshot and a second later, I saw his light come on and him drive away from the scene. That's exactly the type of behavior that the Mendez Court would say, you know, there's not very many people around. This person reacts immediately upon that happening and they drive away from the scene. Even this girl was, are we going to shoot somebody? I'd probably park my car a couple blocks away and not have it right there on the scene. Well, that would depend if you premeditated that shooting. If it wasn't a premeditated shooting, it would happen wherever it happened. Okay, but the fact that somebody was coming from a little further distance and somebody was right there doesn't cut one way or the other, it doesn't seem to me. What's the gap in time from the time that he heard the gunshot until in the video it shows the other vehicles coming towards the scene from points opposite to each other? I think it would have to be, my recollection of the video is it would have to be at least 45 seconds to approximately a minute, I would say. Whereas the defendant's vehicle, there was a gunshot heard and then the lights come on and the defendant immediately leaves. It's almost instantaneous. So it's clear this gunshot and this vehicle have reacted. Possibly it could have been argued maybe this is someone trying to get away that's a victim, but that's not what the fact ultimately showed. And the officer doesn't have to know with certainty, he just has to have a reasonable suspicion. So he's heard a gunshot and he sees a person fleeing from the area where he heard the gunshot. Under Mendez, that's reasonable suspicion. And the facts of Mendez are much closer to this case than the facts of BL where it was found that the officer did not have a reasonable suspicion. You said he was fleeing? Left. Fleeing is a word I wouldn't use. I would say left. I believe in the record, he might have said took off, but it wasn't clarified that he may have just been speaking off the cuff and said he drove away. But suffice to say, he drove away at that time. There was no evidence that he floored it or anything, drove wildly or anything like that. He simply left the area based on a fair reading of the record. Was the direction when he left the area towards where the police officer was sitting or in a different direction? I don't recall the exact direction he drove. I believe it was, the officer was, I think the officer was, they're facing the same direction. I believe he went the same direction as the officer and then took a turn south onto like the nearest cross street and then the officer followed him. And I think they ended up almost back onto Dakota Street by the time the stop was initiated. So it's almost like they just went around the block and then the defendant pulled over almost back in front of where he had started and that's where the stop was initiated. And so I think in some, when we're looking at these cases, this isn't a situation where as defendant claims we need to be afraid of unbridled police activity that's not being checked. This isn't just we heard some gunshots and we're going to stop every single person that we saw. We have one officer who heard the gunshot and then immediately saw activity on an otherwise empty street. And clearly it was reasonable for the officer to use his experience and say these two things are related. And that's why the officer had a reasonable suspicion to initiate the traffic stop. And if you're honest I have any other questions. The people would ask this court to affirm the trial court's order denying the defendant's motion to suppress. Thank you. Thank you Mr. Atwood. Mr. Persons, rebuttal. Listening to my opponent speak of reasonable, what does the law allow for in making what has been commonly referred to as a terry stop? Is it merely that the officers act reasonably? No. They must have a reasonable articulable suspicion of criminal activity based on particularized circumstances carefully scrutinized by courts. Courts such as this one. In this situation the crux of the argument the defense is making and has made since day one is that activating one's vehicle lights at 3.37 in the morning and driving away not speeding, not jetting, not flooring it, but merely activating the lights and driving away is not an articulable suspicion for an officer to state ruining someone's That's what we're maintaining. And as far as location goes my opponent again goes back to the location of Spring Valley. The old saying goes location, location, location. I say the law doesn't recognize any distinction about locations between Spring Valley and the same kind of drug crime riddled area that this case, this court resolved in People v. Moore against the police. In People v. Moore the police went to a drug bar. A drug bar reputed to be a high crime area where there was routine drug trafficking actions seen by officers and seen supposedly that night. But as the lower court in Moore ruled that officers didn't see any changing of money. They didn't see what passed between the two hands of the two individuals they saw in this bar in this location, this high crime area location. And this court said in Moore that could have been anything. That could have been anything and so we can't let you have that search. We can't let you have what you found even though it was drugs. And in this situation the officer Barron's when he sees the car ride up, drive away, he doesn't know that anyone's in the car has a gun. He doesn't see muzzle fire. He doesn't see gun smoke. He doesn't see anybody chuck anything outside the window of the vehicle. He just drove away. Is it reasonable for Officer Barron's to pursue that vehicle? Absolutely. Is it enough for him to stop him? No. Not under the law. Not under the 4th Amendment. Not under the 14th Amendment or Article 1, Section 6 of the Illinois State Constitution which guarantees more than just the rights of a person to be free from circumcision. It guarantees the right of privacy. My client's rights were violated. His rights of privacy, his rights to be free from unlawful government intrusion all on the basis of just him being  they saw in the area when in actuality there was more than one car and they could have stopped any one of those under the circuit court's logic just because they were going into or coming from an area where the police say they've heard shots a matter of minutes from there. So I say that Mendez is not a good test for this Court to adopt. And I would argue that V.L. is much more on point in terms of how does this Court weigh the testimony of the officer, Officer Ershin and Barron's  the only reason we stopped him is because his was the only vehicle we saw in that area after Mendez was shot. And I would argue that the only reason we stopped him was because he was getting the shots. That was it. Not a speeding ticket, not a crossing the line, nothing. To be honest, that's not enough. Not enough under the Constitution and I would argue that this Court must place further limits as it did in Sinclair and as it did in Moore on the actions of police who may think that they have unlimited license to stop anybody who happens to come into an area just so long as the officer can testify later on. Yeah, we heard shots so whatever you've got in your pocket it's empty. I don't want to see that and I don't think the Fourth Amendment would survive an area like that. So I would ask that this Court reverse the lower Court's decision. Thank you. We thank both of you for your arguments this afternoon. We'll take the matter under advisement and we'll issue a written decision as quickly as possible.